Board of Tax and Land Appeals
No. 2007-189

### APPEAL OF PATRICK WALSH & a.
### (New Hampshire Board of Tax and Land Appeals)

Argued: September 13, 2007
Opinion Issued: October 18, 2007

*Keane & Macdonald, P.C.*, of Portsmouth (*Thomas M. Keane* and *Douglas W. Macdonald* on the brief, and *Mr. Macdonald* orally), for the petitioners.

*Beaumont & Campbell Prof. Ass'n.*, of Salem (*Bernard H. Campbell* on the brief and orally), for the respondent.

DUGGAN, J. The taxpayers, Patrick and Karen Walsh, William Walsh, and Thomas and Linda Walsh, appeal a decision of the New Hampshire Board of Tax and Land Appeals (BTLA or board), granting the motion of the respondent, Town of North Hampton (Town), to dismiss their respective tax abatement applications. We affirm.

The record supports the following. On March 1, 2006, the taxpayers filed separate applications for tax abatements with the Town, claiming that the tax assessment, both as to land and buildings, on each of their properties for the tax year 2005 was disproportionately high when compared to the

general level of assessment in the town. Following receipt of the applications, the Town sought to inspect the taxpayers' homes. To this end, the Town's tax assessor attempted to contact the taxpayers' counsel on at least two occasions, including a written request sent on June 22, 2006. The taxpayers never responded to these requests. In mid-August 2006, the Town denied the abatement applications because the taxpayers had neither responded to the requests for inspections nor provided any evidence indicating that their assessments were incorrect. The taxpayers then timely appealed the denials to the board.

Approximately two months later, the board notified the Town of the appeals and asked for certain information concerning the properties. For each appeal, the Town provided the requested information and further asked the board to deny the appeal for, among other things, "lack of local level information." Specifically, the Town asserted that the taxpayers' counsel had "not respond[ed] to numerous requests by the Town for . . . inspection[s] of the subject propert[ies,]" and attached the June 22, 2006 letter in support of its position. The board treated the Town's responses as motions to dismiss "pursuant to RSA 74:17." The taxpayers in turn objected. They denied that the Town contacted them "numerous times," but admitted that their counsel had received the June 22, 2006 letter and one telephone call from a Town representative. The taxpayers maintained that, while "the parties were unable to coordinate a date for the inspection, . . . consent to an inspection was never denied."

On December 6, 2006, the board ordered the parties to "arrange for inspections" of the properties "within twenty (20) days" and deferred ruling on the Town's motions to dismiss. The parties engaged in no further communications until January 2, 2007, when the Town's tax assessor called the taxpayers' counsel to request inspections of the properties. Receiving no response, the assessor sent a letter that same day asking the taxpayers' counsel to contact him to schedule the inspections. By letter dated January 9, 2007, the taxpayers' counsel informed the assessor that he "ha[d] asked [his] clients to provide [him] with some dates and [] w[ould] get back to [the assessor] as soon as possible."

Meanwhile, on January 8, 2007, the board telephoned the Town for an update on the status of the inspections. The next day, the Town sent a letter to the board advising it of the Town's January 2, 2007 telephone call and letter to the taxpayers' counsel. On January 18, 2007, the board dismissed the taxpayers' appeals because the taxpayers' counsel "ha[d] been unresponsive to the Town and the board."

On January 22, 2007, the taxpayers' counsel telephoned the Town's assessor, and, the next day, sent a letter to the assessor confirming this telephone call and informing him that February 1 or 2, 2007, were

convenient dates for the inspections. The letter also states, in pertinent part: "I had previously informed you that the taxpayers would be out of town over the holidays, and that a convenient time for the inspection of their premises would be toward the end of the month."

Also on January 23, 2007, the taxpayers moved for reconsideration of the board's dismissal of the appeals. The taxpayers asserted two grounds for reconsideration. First, relying primarily upon the information contained in their letter of the same date, the taxpayers argued that they had not been unresponsive to the Town's request. Second, the taxpayers contended that inspections of their homes were unnecessary because the inspections were irrelevant to determining whether the land was disproportionately assessed.

On February 6, 2007, before the board ruled upon the motion for reconsideration, the Town inspected the properties. The record contains no evidence indicating that either party notified the board of these inspections. On February 14, 2007, the board denied the taxpayers' motion for reconsideration. First, the board found that the taxpayers and their counsel "were unresponsive both to its December 6, 2006 letter to arrange inspections 'within twenty (20) days' and to the Town's attempts to schedule the inspections." Specifically, the board noted that the taxpayers had not responded to the Town until after the board had contacted the Town to determine the status of the appeals, and after the twenty-day deadline. It emphasized that it was "only after the board dismissed the appeals [that the taxpayers' counsel] contact[ed] the Town regarding 'convenient' dates for inspection." Second, the board found that inspections of the properties were relevant because "[a]ny property tax assessment appeal based on disproportionality requires a review of the market value of the property in its entirety (*i.e.*, land and buildings) and the Town's level of assessment." According to the board, these inspections "further assure[] what is being assessed (the entire property) is accurately depicted on the assessment-record card[s]." On March 15, 2007, the taxpayers filed this appeal.

RSA chapter 541 governs appeals from BTLA decisions. RSA 71-B:12 (2003 & Supp. 2006); *Appeal of Town of Wolfeboro*, 152 N.H. 455, 458 (2005). Under RSA 541:13 (2007), "we will not set aside the board's order except for errors of law, unless we are satisfied, by a clear preponderance of the evidence, that it is unjust or unreasonable." *In re Huston*, 150 N.H. 410, 411 (2003). "Findings of fact made by the BTLA on questions properly before it are deemed *prima facie* lawful and reasonable." *Wolfeboro*, 152 N.H. at 458; *see* RSA 76:16-a, V (2003); RSA 541:13. "This presumption may be overcome only by a showing that there was no evidence from which the board could conclude as it did." *Huston*, 150 N.H. at 411. "[W]e will set

aside an order of the board if we find that it misapprehended or misapplied the law." *Appeal of Reid*, 143 N.H. 246, 248 (1998); *see* RSA 76:16-a, V.

On appeal, the taxpayers assign five errors to the board's decision. First, they contend that the Town had no authority to seek inspections of the properties, and even if it did, the board's finding that the taxpayers were "unresponsive" to the Town's request for inspections is unsupported by the evidence. Second, the taxpayers maintain that the Town was required to obtain administrative inspection warrants under RSA 74:17, I (2003) before denying their abatement requests based upon their alleged unresponsiveness to the Town's inspection requests. Third, the taxpayers assert that the board improperly dismissed their abatement requests with respect to the land valuation assessments because inspections of their homes were not required for the board to review these aspects of their appeals. Finally, in their fourth and fifth bases for appeal, the taxpayers argue that with respect to the building valuation assessments, the board erred in dismissing their appeals for lack of inspections because they did not contest their buildings' characterizations, but rather, only the disproportionality of the assessments within those characterizations.

Before addressing the merits of the taxpayers' assignments of error, we first take note of procedural deficiencies that infect the taxpayers' positions in this appeal. *Appeal of White Mtns. Educ. Assoc.*, 125 N.H. 771, 774 (1984). "In an administrative appeal pursuant to RSA chapter 541, the appealing party must first file a motion for rehearing setting forth fully every ground upon which it is claimed that the decision or order complained of is unlawful or unreasonable." *Appeal of Coffey*, 144 N.H. 531, 533 (1999) (quotation omitted); *see* RSA 541:4 (2007); *Appeal of Hardy*, 154 N.H. 805, 809 (2007). "Any ground not set forth in the motion for rehearing is not reviewable on appeal, absent good cause shown to specify additional grounds." *Appeal of Barry*, 141 N.H. 170, 173 (1996) (citation omitted); *see* RSA 541:4. "The reason for these requirements is obvious: administrative agencies should have a chance to correct their own alleged mistakes before time is spent appealing from them." *White Mtns.*, 125 N.H. at 774. "[W]hen a record does not demonstrate that the appealing party has met the requirements of [RSA 541:4] we will refuse the appeal or dismiss it on our own motion." *Id.* at 775; *see Hardy*, 154 N.H. at 811.

In their motion for reconsideration, the taxpayers asserted two reasons why the board should not have dismissed their appeals: (1) the taxpayers had not been unresponsive to the Town's request for inspections; and (2) the inspections were irrelevant to determining whether the land itself was disproportionately assessed. The taxpayers have reasserted these two bases for reconsideration in their first and third grounds for appeal.

Therefore, the taxpayers' appeal as to the first and third issues meets the requirements of RSA 541:4.

■ The taxpayers, however, failed to move for reconsideration with respect to the remaining issues that they have appealed. RSA 541:4 required the taxpayers to "set forth *fully every ground* upon which [they] claimed that" the board's order was unlawful or unreasonable. RSA 541:4 (emphasis added). Because the taxpayers failed to comply with the requirements of RSA 541:4 as to three of the five issues raised on appeal, and because they have not shown good cause to justify this failure, we hold that these claims were not properly preserved for purposes of this appeal and, therefore, we will not consider them. *Barry*, 141 N.H. at 173; *see also Hardy*, 154 N.H. at 811.

We now turn to the first of the two remaining issues. The taxpayers contend that the board's finding that they were "unresponsive" to the Town's request for inspections is unsupported in the record, and, therefore, the board erred in dismissing their appeals. Specifically, the taxpayers assert that they never "refused to grant consent" to enter the properties for inspections, and further emphasize that the Town did inspect the properties on February 6, 2007. As stated above, the board's findings of fact are deemed *prima facie* lawful and reasonable, *Wolfeboro*, 152 N.H. at 458, and the burden is upon the taxpayers to show that the board's decision was clearly unreasonable or unlawful, *Porter v. Sanbornton*, 150 N.H. 363, 371 (2003). "We must affirm the board's factual findings unless we determine that there [i]s no evidence from which the board could conclude as it did." *Huston*, 150 N.H. at 414. Here, the record supports the board's finding that the taxpayers were "unresponsive" to the Town's request for inspections.

When it held the Town's motion to dismiss in abeyance, the board knew that the taxpayers' counsel had not responded to at least two earlier requests by the Town for inspections. The taxpayers did not dispute this fact. Rather than dismiss the appeals at the outset for lack of inspections, however, the board provided the taxpayers with another opportunity to allow inspections. Again, the taxpayers failed to act. While the board's December 6, 2006 order required both parties to arrange for inspections, it was the taxpayers that had the burden of showing that the tax assessments were disproportionate. *Gail C. Nadeau 1994 Trust v. City of Portsmouth*, 155 N.H. 810, 812 (2007). Despite this burden of proof, the taxpayers did not contact the Town's assessor to schedule inspections within the board's twenty-day deadline.

■ Furthermore, even after the *Town* attempted to schedule inspections a week after the twenty-day deadline, the taxpayers' counsel did not

respond for another week. When he finally did respond, almost five weeks after the board's December 6, 2006 order, it was simply to state that he would provide the assessor with convenient dates for the inspections "as soon as possible." Moreover, as the board noted in its order on the taxpayers' motion for reconsideration, the taxpayers' counsel did not inform the assessor that February 1 and 2, 2007, were convenient dates for inspection until *after* the board dismissed the case. Finally, even though the inspections had occurred on February 6, 2007, approximately one week before the board denied the taxpayers' motion for reconsideration, the taxpayers never saw fit to inform the board of this fact. In these circumstances, where the taxpayers had numerous opportunities to schedule inspections but failed to do so, we conclude that the board had sufficient evidence from which it could reasonably find that the taxpayers were "unresponsive" to the Town's requests for inspections. Accordingly, we affirm the board's finding that the taxpayers were unresponsive.

Given this finding, we next consider whether the board could properly dismiss the appeals on this basis. "The powers of the board and the rights of taxpayers appearing before the board are entirely statutory and are limited by the terms of the statute." *Appeal of Land Acquisition, L.L.C.*, 145 N.H. 492, 494 (2000) (quotation omitted).

RSA 74:17, II (2003) provides:

> Any person who refuses to grant consent to the selectmen or assessing officials to enter property for the purpose[] [of obtaining information necessary to complete an inventory under RSA chapter 74 or appraisal under RSA chapter 75] shall lose the right to appeal any matter pertaining to the property tax for which such person is liable and the right to appeal any exemptions for which such person may be entitled but has not yet received.

Thus, taxpayers must either allow assessors to inspect their properties when the assessors seek to obtain information necessary to complete inventories or appraisals, or lose their right to appeal any matter pertaining to the properties' taxes.

The parties do not dispute that the board based its dismissal of the taxpayers' appeals upon RSA 74:17. The taxpayers argue, however, that RSA 74:17, II did not authorize the Town to seek inspections of their properties because: (1) the Town did not seek information for an inventory under RSA chapter 74; and (2) RSA chapter 75 does not apply because it does not address tax abatement applications. Assuming without deciding that the Town was not seeking information for an inventory under RSA

chapter 74, we disagree that RSA chapter 75 does not apply simply because it does not specifically refer to tax abatement applications.

Under RSA 74:11 (2003), selectmen are required to assess a tax against a person "in accordance with *their appraisal* of the property" at issue, "unless they [are] of the opinion that [their appraisal] does not contain a full and true statement of the property for which such person ... is taxable." (Emphasis added.) RSA chapter 75, entitled "Appraisal of Taxable Property," outlines the specific methods for appraising property. RSA 75:1 (2003). "The appraisal of property determines its value. The assessment of property *based on the appraisal* determines the amount of tax for which a particular piece of property (or taxpayer) is required to pay." 16 P. LOUGHLIN, NEW HAMPSHIRE PRACTICE, MUNICIPAL LAW AND TAXATION § 22.01, at 253 (1993 & Supp. 2003) (emphasis added). Because a tax assessment is based upon a property's appraisal, an inaccurate appraisal would affect the property's assessment.

■ Here, the taxpayers asserted that their properties' assessments, which were based in part upon the Town's prior appraisals of these properties, were disproportionate. The Town obtained the prior appraisals pursuant to RSA chapter 75 and listed the appraisals on the properties' tax record cards. The Town sought to inspect the taxpayers' properties to verify, among other things, that these prior appraisals were accurate and complete so that it could then sensibly determine whether the taxpayers had shown good cause to abate the tax assessments of their properties. RSA 76:16, I (Supp. 2006). In confirming the accuracy of these initial appraisals, the Town's assessor would have effectively reappraised the properties by using the methods and standards for appraisals listed in RSA chapter 75. Accordingly, we conclude that the Town sought to enter the properties for the purpose of obtaining information necessary to complete appraisals under RSA chapter 75, a purpose delineated in RSA 74:17.

The taxpayers also appear to argue that, even if they were "unresponsive" to the Town's requests for inspections, they "never refused a request for an inspection" such that they lost their rights to appeal under RSA 74:17. The taxpayers are correct that, pursuant to RSA 74:17, they would not have lost their rights to appeal the Town's abatement denials unless they "refuse[d] to grant consent" to the assessors to enter their properties. Here, the board dismissed the appeals under RSA 74:17 because the taxpayers were "unresponsive" to the Town's requests for inspections. In effect, the board concluded that the taxpayers' "unresponsiveness" was tantamount to a "refus[al] to grant consent" to the assessors for the inspections. We find no error in this finding.

In matters of statutory interpretation, we are the final arbiters of the legislative intent as expressed in the words of the statute considered as a whole. *Petition of State of N.H. (State v. Johanson)*, 156 N.H. 148, 151 (2007). When examining the language of the statute, we ascribe the plain and ordinary meaning to the words used. *Id.* We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.*

■ WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1910 (unabridged ed. 2002) defines "refuse" as, among other things, "to show or express a positive unwillingness to do or comply with (as something asked, demanded, expected)." Here, as explained above, the taxpayers had numerous opportunities to permit the Town's assessor to inspect their properties. Rather than affirmatively acting to grant or deny the assessor permission to enter their properties, the taxpayers simply failed to respond to the Town's multiple requests for inspections. In so doing, the taxpayers expressed an unwillingness to comply with the Town's request for inspections, and thus "refuse[d] to grant consent" to the assessors to enter their properties. Accordingly, we conclude that the board properly found that the taxpayers lost their right to appeal when they failed to respond to the Town's requests for inspections.

Finally, the taxpayers argue that the board erred in requiring inspections of their *homes* before examining their challenges to the land assessments. According to the taxpayers, such inspections were irrelevant to the board's ability to evaluate the land assessments, and, therefore, the board could have addressed the land assessments independently. We disagree.

In their abatement applications, the taxpayers asserted that the assessments of their properties, "both as to the land and buildings," were disproportionately high when compared to the general level of assessment in the Town and other similarly situated property. "[T]o carry the burden of proving disproportionality, a taxpayer must establish that the taxpayer's property is assessed at a higher percentage *of fair market value* than the percentage at which property is generally assessed in the town." *Verizon New England v. City of Rochester*, 151 N.H. 263, 272 (2004) (emphasis added); *see Nadeau 1994 Trust*, 155 N.H. at 812. The question to be determined is whether the taxpayers are unlawfully or unjustly taxed as between them and other taxpayers. *Nadeau 1994 Trust*, 155 N.H. at 812.

In asserting that the land assessments should have been separately addressed, the taxpayers are treating their land as distinct taxable

properties from their buildings. Assuming this distinction is both plausible and relevant, the taxpayers "had the burden of proving that [their] taxable propert[ies] w[ere] *in the aggregate* overvalued and the *total* assessment[s] excessive." *Crown Paper Co. v. City of Berlin*, 142 N.H. 563, 569 (1997) (emphases added); *see Appeal of Sunapee*, 126 N.H. 214, 217 (1985); *Amoskeag Mfg. Co. v. Manchester*, 70 N.H. 200, 205 (1899). "If the assessed value of one property is high, but the average assessment on all properties owned by the taxpayer is proper, the taxpayer will not be entitled to an abatement since justice does not require the correction of errors of valuation whose joint effect is not injurious to the appellant." LOUGHLIN, *supra* § 27.07, at 282.

█ Thus, even if the board could have addressed the land assessments separately, it would still have needed to examine those assessments in conjunction with the buildings' assessments to determine whether the taxpayers were being disproportionately taxed. While the taxpayers attempt to split the assessments into land and buildings, the board correctly found that "[a]ny property tax assessment appeal based on disproportionality requires a review of the market value of the property in its entirety (*i.e.*, land and buildings) and the Town's level of assessment." Because the taxpayers do not raise the broader question of whether inspections were necessary for the board to evaluate the abatement applications, we do not address it. Accordingly, we conclude that the board lawfully dismissed the appeals under RSA 74:17.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, GALWAY and HICKS, JJ., concurred.